IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

MICHAEL J. WOODS                    §
                                    §
VS.                                 §  CIVIL ACTION NO.4:05-CV-724-Y
                                    §
MARY E. PETERS, Secretary           §
Department of Transportation        §
Federal Aviation Administration     §

ORDER PARTIALLY GRANTING DEFENDANT'S
MOTION TO STRIKE, DENYING PLAINTIFF'S MOTION
TO STRIKE AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

     Michael J. Woods, a black man, has filed suit against Mary E.

Peters, Secretary, Department of Transportation, Federal Aviation

Administration ("FAA"), alleging racial and age discrimination in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§2000e, *et seq.*, after he applied for a position at the Dallas-Fort

Worth Terminal Radar Approach Control [TRACON] Facility ("DFW

TRACON") and was rejected in favor of two younger white

candidates.[1]  Secretary Peters has filed a motion (doc. #23) for

summary judgment arguing that Woods has failed to establish a *prima

facie* case of discrimination and that Woods has failed to show that

her legitimate, non-discriminatory reason for his nonselection is

a pretext for intentional discrimination.  Both parties have also

_____

     [1] Although a total of four candidates were selected, Woods only complains
of two being selected over him and claims their selection over him was the result
of intentional discrimination based on his race and age.  Also, the record
suggests that one of the other two individuals (not the two complained of by
Woods) may be African-American.  There is no competent summary-judgment evidence,
however, that one of the candidates was in fact an African-American.  As will be
discussed below, Secretary Peters argues that Woods fails to make out a *prima
facie* case for discrimination because he fails to establish that he was qualified
for the position he sought.  She does not argue that Woods fails to make a *prima
facie* case because one of the selected candidates was African-American.

moved (docs. ##33 & 37) to strike portions of each other's respective summary-judgment evidence. After review, the Court PARTIALLY GRANTS Secretary Peters's motion to strike, DENIES Woods's motion to strike, and GRANTS Secretary Peters's motion for summary judgment.

I.   Factual Background

Michael Woods is a 48-year-old African-American air-traffic controller employed with the FAA. In September 2003, he submitted a request through the FAA's internal-placement program ("IPP") to transfer from the Addison control-tower facility to a position at the DFW TRACON. As part of the transfer application, Woods completed FAA Form 3330: "Rating of Air Traffic Experience for CPC[2] Position." (Def.'s App. at 3.)(Pl.'s App. at 25.) The form contains Woods's experience, education, ratings, and awards. (*Id.*) Nowhere on the form is there any information disclosing Woods's race or ethnic background. (*Id.*)

According to the form, Woods worked at the Baton Rouge TRACON facility from January 1979 until October 1981. As a new hire, Woods was required to obtain his CPC for the Baton Rouge TRACON facility. To become a CPC, Woods was required to certify on all positions at the facility. This involved attendance at the FAA training academy, classroom instruction at the facility, passing

_____

[2] CPC stands for Certified Professional Controller.

exams, and on-the-job training. Once he passed all of his exams and demonstrated an ability to work independently at all of the positions at the facility, Woods would receive his CPC. Woods received his CPC in September 1980, eight months after he started there. Although Woods was certified at the Baton Rouge TRACON facility, that certification would not transfer with him should he be transferred to another facility. If Woods transferred to another facility, he would be considered a CPC-in-training until he met that facility's requirements for certification.

In October 1981, Woods left the FAA but was rehired in March 2000.[3] Because of the lengthy break in his FAA service, Woods was required to attend "Rehired Terminal Control Training." (Def.'s App. at 15.) The purpose of this training was to reacquaint Woods with the technical aspects in a terminal radar environment, cultural aspects of air-traffic control, and the changes that had occurred since 1981.

Woods was then assigned to the Amarillo control-tower facility. A control-tower facility normally has four functions on which an air-traffic controller must become certified to receive his CPC. These functions are flight data, clearance delivery, ground control, and local control. Amarillo, however, is considered an "up-down" facility, which means it has both control-tower functions and radar functions. (Def.'s App. at 13.) To become a

_____

[3] The record does not disclose why Woods left the FAA in October 1981.

CPC at the Amarillo control-tower facility, Woods was required to certify in all four control-tower functions and its radar positions. Woods's form indicates that he received his certification in the control-tower functions in August 2000, but did not receive his CPC for the Amarillo facility, which means Woods had not certified in the radar positions there. To obtain certification for the radar positions, Woods was required to attend classroom training, pass an examination, attend assimilation training on radar, and receive the required amount of on-the-job training and demonstrate an ability to work those positions independently. (*Id.* at 12-13.)

At the time Woods applied for a position at the DFW TRACON facility through the IPP, he was an air-traffic controller at the Addison control-tower facility and had been at that facility since September 2000. The FAA classifies Addison control tower as a level-seven facility. The various air-traffic-control facilities are classified at various levels depending on the complexity and amount of air traffic the facility is required to handle. The complexity factor is determined by the demands that a sustained level of air-traffic congestion, which may reduce an air-traffic controller's options for movement of an aircraft, will place on the judgment, skill, and decision-making ability of an air-traffic controller. Air-traffic-control facilities are rated from level four, which has the least complex and congested air traffic, to

level twelve, which has the most complex and congested.  (*Id.* at 18.)

The Addison facility is a visual flight rules ("VFR") control tower.  As an air-traffic controller at the Addison facility, Woods was responsible for separating aircraft by issuing clearances, air-traffic information, and advisories to aircraft landing, departing, or operating within his area of responsibility.  This is accomplished primarily by visual observation of the aircraft with the aid of D-BRITE equipment (Bright Radar Indicator Tower Equipment). The Addison facility, however, does not have radar positions.  (*Id.* at 15-16.)(Pl.'s Resp. at 12.)

Woods's Form 3330 reflects that he received his CPC for Addison in January 2001.  Woods also received his certification on the D-BRITE in April 2003, which means Woods knows how to use that equipment.  (Def.'s App. at 15-16.)  And Woods passed a radar qualification exam in October 2003, which means he is certified to use the D-BRITE equipment for separation of air traffic at a VFR control-tower facility.  (*Id.* at 16.)  These certifications do not reflect that Woods is certified on a radar position.  (*Id.*)

In September 2003, JoEllen Casilio, the air-traffic manager for the DFW TRACON facility, received word that her facility would gain several positions so long as she filled them before the end of the fiscal year, September 30, 2003.  The DFW TRACON facility is classified as a level twelve facility, and radar is used exclu-

sively to separate air traffic at the facility. (*Id.* at 14, 18.)
An air-traffic controller at this facility is required to be
certified on numerous radar functions such as an arrival function,
a departure function, a satellite function, and a feeder function.
(*Id.* at 14.) Each function may have several positions, each of
which has its own unique and defined responsibilities and require
training and certification. (*Id.*)

The training on the radar positions involves complex radar
functions such as turning planes, reducing or increasing altitude,
and maintaining aircraft separation. (*Id.* at 15.) Air-traffic
controllers are trained to view the radar screen three
dimensionally, and it is not unusual for an air-traffic controller
to take twenty-two months to four years to obtain his CPC. (*Id.*)
This training is not the training an air-traffic controller would
receive in a VFR control-tower facility using the D-BRITE equip-
ment. (*Id.*)

Due to the intense and complex nature of the work, Casilio
states that she only considered candidates who had applied for a
position at the DFW TRACON facility through the IPP. In other
words, she did not consider any new hires. She furthered narrowed
the list of qualified candidates to those whose forms indicated
that they had recently obtained their CPC at a facility with radar
positions rated above level eight. (*Id.* at 5.) She then consid-
ered the length of that experience and, if there was a tie between

candidates, she considered their education and prior military or private company air-traffic control experience. Her criteria for selection was based on her belief, following years of experience in the FAA, that

> full performance CPCs that were presently or recently at a higher level facility with radar positions generally are successful in their training . . . and [are] ultimately certified. The busier the facility that the candidate worked at, the quicker their certification . . . . Generally, people who come from level [eight] and below struggle to certify at [the DFW TRACON facility].

(*Id.* at 5.)

Casilio selected Kevin Johnson, Bruce Prieur Jr., Troy Clogston, and Gregory Fleetwood to fill the newly funded positions. She selected Johnson, she explains,

> because his Form 3330 reflected he was employed at the Las Vegas TRACON, a level 10 facility, since July 2001, and had been certified at that facility since September 2002. Because Mr. Johnson became a full performance CPC at this level 10 facility in a thirteen month period, I felt he was a good candidate to successfully train at [the DFW TRACON] within a relatively short length of time.

(*Id.* at 6.) She explained Prieur was selected

> because his Form 3330 reflected he was employed at the Detroit TRACON, [a level 11 facility], since June 1997, and had been certified at that facility since September 1999. Because Mr. Prieur became a full performance CPC at this level 11 facility in a twenty-seven month period, I felt he would be a good candidate to successfully train at [the DFW TRACON facility] within a short length of time.

(*Id.*)  Clogston was selected by Casilio

> because his Form 3330 reflected he was em-
> ployed at the Savannah TRACON, a level 8
> facility since November 2001, and had been
> certified at that facility since October 2002.
> Because Mr. Clogston became a full performance
> CPC at this level 8 facility within an eleven
> month period, I felt he would be a good candi-
> date to successfully train at [the DFW TRACON
> facility] within a moderate length of time.
> Additionally, Troy Clogston was part of a
> three-way mutual reassignment.  A mutual
> reassignment allows a CPC to swap positions
> with a CPC at another facility.  It is within
> the discretion of each manager at the affected
> facilities to approve the mutual reassign-
> ments, however, denial was discouraged because
> the belief was it [benefitted] the agency to
> have people located in an area that they
> wanted to be in.  The Clogston swap was ar-
> ranged long before I became the manager in
> 2003 and difficulties caused it to be put on
> hold until this vacancy.  I felt I needed to
> honor [the] commitment made by former manage-
> ment.

(*Id.* at 6-7.)  And Casilio explained she selected Fleetwood

> for two reasons.  First, Gregory Fleetwood's
> Form 3330 reflected he had been employed at
> the Baton Rouge TRACON from June 1998 to June
> 1999, and certified at that facility within
> four months.  I have found that CPCs from
> Baton Rouge tend to be successful in training
> at [the DFW TRACON facility] because the
> traffic flow and patterns at Baton Rouge
> provide a good basis to prepare a candidate
> for traffic at [the DFW TRACON facility].  The
> Form 3330 reflected Mr. Fleetwood had a break
> in service between June 1999 and December
> 2002.  The Form 3330 further reflected Mr.
> Fleetwood was re-employed by [the] FAA in
> December at the Control Tower in Addison and
> certified there within four months.  I had
> personal knowledge concerning Mr. Fleetwood's
> separation from the FAA in June 1999.  During
> that time, I was the Assistant Air Traffic

Division Manager at the Southwest Regional
Office . . . . The Resource Branch Manager,
Jim Owens, part of my staff in Fort Worth,
notified me that Fleetwood's background check
revealed he did not disclose a certain event,
I believe it was financial in nature, in his
paperwork . . . . I advised Mr. Owens that
this is not uncommon and advised him that
further investigation reveals that it is
usually an inadvertent omission. As in this
case, it often happens because people do not
completely understand the question but still
feel they need to provide some answer. I told
him we normally consider the person suitable
for employment and counsel them on the gravity
of providing accurate and detailed responses
to paperwork. I also gave Mr. Owens the
authority to make the decision on the disposi-
tion of this case. I told him I would support
his decision. He decided to terminate Mr.
Fleetwood in the last few days of his year
probation. I felt [that] did not warrant
termination but I supported the decision
because I told the manager I would.

When I noticed Mr. Fleetwood was rehired
and was on the transfer list, and his experi-
ence reflected he had relatively recent expe-
rience in a facility with radar positions
(Baton Rouge), I decided to select Mr.
Fleetwood. This is the second reason I chose
him; to right a wrong done by the FAA in which
I personally participated. I would not have
selected Mr. Fleetwood if he had no recent
experience in a radar position just to right
the wrong. Based on his past experience and
that he certified in record time at each of
the facilities he was at, I felt he could be
successful in his training at [the DFW TRACON
facility].

(*Id.* at 7-8.)

Casilio did not select Woods, she explains,

because his Form 3330 did not relfect recent
radar experience, that is, he had not held and
certified on a radar position with the FAA in

9

over 20 years.  Mr. Woods's Form 3330 re-
flected he had been employed with the FAA at
Baton Rouge from January 1979 to October 1981,
and certified at that facility within eight
months.  However, that is the last experience
Mr. Woods had in a radar position with the
FAA.  Mr. Woods's Form 3330 further reflects
he separated from the FAA in October 1981 and
returned in March 2000, and was assigned to
the Control Tower at Amarillo.  Amarillo is an
"up-down" facility with radar positions but
Mr. Wood's Form 3330 reflected he had only
certified in the tower positions, not the
radar positions.  I was looking for CPCs with
recent radar experience (experience in a radar
position).   In my selection process, I
consider[ed] college degrees and military or
private company air traffic control experience
as a "tie breaker" when candidates are equally
qualified in the radar experience I am looking
for.  I did not feel Mr. Woods was equally
qualified to any of the four people I selected
so I did not consider his college degree, his
pilot's license, or any other factors.  Simply
stated, Mr. Woods's experience in a radar
position was too long ago for me to feel he
could successfully train and certify at [the
DFW TRACON facility].

(*Id.* at 8-9.)  Casilio affirms that she did not consider any

candidates' race or age in making her selections.  (*Id.* at 10.)

She further states that

I do not believe I knew the selectees' or Mr.
Woods's race or age at the time of the selec-
tion.  The transfer requests that I based my
decision on did not disclose the race or age
of each candidate.

(*Id.*)  Elaborating a little more in her deposition, Casilio

admitted that at one time or another she had previously met many of

the candidates (before they were candidates) on the IPP list and

that when she did so she "obviously could tell their color."

10

(Def.'s App. to Reply at 2.)  Specifically, she explained,

> I met [meaning previously] many candidates on
> that list.  When I talked to them, I obviously
> could tell their color.  I don't always put a
> name with the—and a face with the selection
> list, so I can't say that I knew Mr. Woods's
> color when I selected Bruce and Kevin and Greg
> and Troy.

(*Id.*)[4]  In other words, when Casilio reviewed the candidates on the IPP list seeking to transfer to the DFW TRACON, she recognized many of the names on the list as individuals she had previously met but she did not recall exactly who these people were, and didn't remember their races.  Casilio did not meet with or speak to any of the candidates as part of her selection process.

## II.  Analysis

### A.  Objections to Evidence

#### 1.  Woods's Objections

In his response, Woods "moves the Court to strike the declarations of Joe Bialek and Alan Phillips in support of

---

[4]  Normally, the Court would not consider new evidence presented with a reply.  *See Weber v. Merrill Lynch Peirce Fenner & Smith, Inc.*, 455 F. Supp. 2d 545, 551 (N.D. Tex. 2006)(Fitzwater, J.); *Dethrow v. Parkland Hospital System*, 204 F.R.D. 102, 103-04 (N.D. Tex. 2001)(Fitzwater, J.)("A summary-judgment movant may not, as of right, file an appendix in support of his reply brief.").  In this case, however, Woods's response specifically references this statement in Casilio's deposition to try to argue that "she stated that she could tell someone's color/race after speaking with them on the phone." (Pl.'s Resp. at 9.) Submitting the full context in which Casilio's statement was made in her deposition is appropriate because it shows that Casilio never asserted that she could tell someone's race by simply speaking with him over the phone.

Defendant's motion for summary judgment . . . ."[5] (Pl.'s Resp. at 2.) Woods argues that Phillips's declaration "is hearsay at best and full of speculations and conjecture." (*Id.* at 3.) In particular, Woods complains that Phillips's statements regarding what type of training he received and when he received that training is speculation because Phillips was not present when Woods received the training. Thus, Woods argues, Phillips cannot say for certain what type of equipment Woods was trained on, cannot say for certain what the training entailed, and cannot say for certain whether Woods actually attended the training.

Under Federal Rule of Civil Procedure 56(e), affidavits or declarations must be based on personal knowledge. "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to matters stated therein." FED.R.CIV.P. 56(e). "Nonetheless, while an affidavit certainly *can* explicitly state that it is based on 'personal knowledge,' there is no requirement for a set of magic words." *DirectTV, Inc. v. Budden,* 420 F.3d 521, 529-30 (5th Cir. 2005)(emphasis in original). Nor is the affidavit or declaration required to affirmatively state that the affiant is competent to testify to the matters stated therein. *Id.* In the summary-

---

[5] Normally, objections to summary-judgment evidence should be made by filing a separate motion to strike.

judgment context, it is "proper . . . for district courts to rely on affidavits where the affiants' personal knowledge and competence to testify are reasonably inferred from their positions and the nature of their participation in the matters to which they swore." *Id.* (internal quotations and citations omitted).

Here, at the time of his declaration, Phillips was employed with the FAA "as a training specialist in the Administrative Group of the Air Traffic Organization . . . ." (Def.'s App. at 11.) His "duties include[d] managing the training program for the Central Service Center and supporting EnRoute and Terminal Training programs in which [he] serve[d] as an expert consultant on all phases of air-traffic training." (*Id.*) In his position, Phillips stated that he readily had access to training records that the FAA maintains in the ordinary course of business. (*Id.*) Thus, it is reasonable to infer that Phillips, based on his position, has personal knowledge and is competent to testify as to the training programs and the purpose of those training programs that air-traffic controllers have attended.

In his declaration, Phillips stated that he reviewed Woods's training record, which he stated was kept by the FAA in the normal course of business, and described the training reflected in Woods's record. He also explained the purpose of the particular training, what that training entailed, and what any certificate from that training meant. Phillips never claimed that he personally saw

Woods take the training listed in his training record. Neverthe-less, because Phillips states that Woods's training record was kept by the FAA in the normal course of business, it is reasonable to infer that Woods received this training (especially in light of the fact that Woods never denies it), and Phillips is competent to testify as to what that training entailed. Moreover, if Woods desired a more detailed account of the equipment used at his training and the type of training he received, he could have provided that to the Court through his own affidavit. He chose not to do so.

Woods complains that Bialek's declaration "basically makes . . . speculations." (Pl.'s Resp. at 4.) The first speculation Woods complains of is Bialek's statement that

> the complexity and volume of DFW traffic was nearly six times the volume and complexity of the traffic at Addison Control Tower in 2006. The difference in the complexity and amount of air traffic between the two facilities in 2003 would be similar in that both were rated at the same levels as they were in 2006.

(Def.'s App. at 18.)(Pl.'s Resp. at 4.) This statement, however, is more of an opinion than speculation. Bialek's declaration indicates that he is employed by the FAA "as the Senior Advisor to the Director of Terminal Operations at the Southwest Regional Office in Fort Worth, Texas." (Def.'s App. at 17.) His duties include "managing guidance and/or policy to field facilities (Control Towers and Terminal Radar Control Facilities (TRACON))

from the Director or headquarter[s]." (*Id.*)  In his position, Bialek assists "the Director in managing one-hundred FAA facilities, as well as seventy-five contract towers" in the area. (*Id.*)  Clearly Bialek is competent to opine as to the amount and complexity of air traffic at the DFW TRACON and Addison facilities.

Woods further contends that Bialek was speculating when he stated "larger level facilities may have a greater number of air-traffic controllers on duty than smaller facilities, but this does not decrease the complexity of maneuvering aircraft in a congested airspace." (*Id.* at 18.)  Again, the Court concludes based on Bialek's background and experience, he is competent to make this statement.

Finally, Woods objects to both Phillips's and Bialek's statements regarding Woods's training and use of D-BRITE equipment. Woods argues that D-BRITE is radar equipment and that "both Phillips and Bialek do not seem to have knowledge of the type of equipment with which Woods trained." (Pl.'s Resp. at 4.)  Both declarations, however, illustrate that Phillips and Bialek are very familiar with D-BRITE equipment and its use as an aid for air-traffic controllers in a VFR control tower.  Woods's objections are overruled.

### 2.  Secretary Peters's Objections

Secretary Peters objects to paragraph five of Danal Johnson's

declaration in Woods's appendix.  In paragraph five, Johnson states,

> In addition, Mr. Woods is familiar with [the DFW TRACON] procedures as a result of him presently being assigned to the Addison Tower. Addison Tower and DFW TRACON Letter of Agreement (LOA) allows Addison Tower controllers to provide radar separation between arrival and departures, between successive departures by utilizing the D-BRITE radar display.  In order to provide proper radar separation, a controller has to be radar certified.

(Pl.'s App. at 3.)  Secretary Peters argues this paragraph should be struck because Johnson's declaration fails to show that he has personal knowledge as to Woods's familiarity with the DFW TRACON procedures and it fails to show Johnson's personal knowledge of the letter of agreement between the DFW TRACON facility and Addison. (Pl.'s App. at 3.)

According to Johnson's declaration, he is currently employed by the FAA as a front-line manager at the Baton Rouge TRACON. Although Johnson's declaration lists an extensive employment history, nowhere does it indicate that he has ever worked at either the DFW TRACON or Addison facilities.  Further, it fails to disclose how and in what capacity he knows Woods.  And the declaration fails to show how he is or came to be familiar with the letter of agreement between the two facilities.  Secretary Peters's objection is sustained.

Secretary Peters also objects to the documents contained in Woods's appendix because they are unauthenticated.  The objection

to the DFW TRACON and Addison facilities' letter of agreement is sustained as there is no evidence to authenticate it. Secretary Peters's objection to the remaining documents is overruled. Although these documents are unauthenticated as well, they are referred to in Secretary Peters's brief and do not contradict her evidence.

## B. Summary-Judgment Standard

Summary judgment is proper when the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). An issue is considered "genuine" if "it is real and substantial as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489 (5th Cir. 2001). Facts are considered "material" if they "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether there are any genuine issues of material fact, the Court must first consult the applicable substantive law to ascertain what factual issues are material. *Lavespere v. Niagra Mach. & Tool Works*, 910 F.2d 167, 178 (5th Cir. 1990). Next, the Court must review the evidence on those issues, viewing the facts in the light most favorable to the nonmoving party. *Id.; Newell v. Oxford Mgmt. Inc.*, 912 F.2d 793, 795 (5th Cir. 1990).

In making its determination on the motion, the Court must look at the full record including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. *See* FED. R. CIV. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). Rule 56, however, "does not impose on the district court a duty to sift through the record in search of evidence to support" a party's motion for, or opposition to, summary judgment. *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). Thus, parties should "identify specific evidence in the record, and . . . articulate" precisely how that evidence supports their claims. *Forsyth v. Barr*, 19 F.3d 1527, 1536 (5th Cir. 1994). Further, the Court's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

When the moving party has carried its summary-judgment burden, the respondent must go beyond the pleadings and produce evidence that sets forth specific facts showing there is a genuine issue for trial. *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986); *see also* FED. R. CIV. P. 56(e). This burden is not satisfied by creating some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See*

*Anderson*, 477 U.S. at 249-50.

C.  Discussion

Secretary Peters's summary-judgment motion presents two arguments: First, that Woods has failed to establish a *prima facie* case of discrimination, and second, that Woods fails to show that her legitimate and nondiscriminatory reason for his nonselection is a pretext for intentional discrimination.

Claims of racial discrimination that are based only on circumstantial evidence are evaluated under a three-part burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-805 (1973).[6]

> Under this three-part scheme, a plaintiff must first establish a *prima facie* case of discrimination by showing: (1) he belongs to a protected group; (2) he was qualified for the position sought; (3) he suffered an adverse employment action; and, (4) he was replaced by someone outside the protected class. *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993).*

> If a plaintiff is successful in establishing his *prima facie* case, a presumption of discrimination arises and in the second step of the analysis, the burden shifts to the defendant to produce a legitimate, nondiscriminatory justification for its action. *McDonnell Douglas, 411 U.S. at 802.* The defendant's burden during this second step is satisfied by producing evidence, which, "*taken*

---

[6] Direct evidence cases are those that contain evidence that would serve to prove unlawful discrimination without any inferences or presumptions. *See Scales v. Slater,* 181 F.3d 703, 709 n.6 (5th Cir. 1999).

19

*as true,* would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *Hicks, 509 U.S. at 509* (emphasis in original). If the defendant articulates a reason that can support a finding that its actions were nondiscriminatory, the mandatory inference of discrimination created by the plaintiff's *prima facie* case drops out. *Hicks, 509 U.S. at 510-11.*

Finally, in the third stage of the burden-shifting framework, the plaintiff is given a "full and fair oportunity to demonstrate" that the defendant's proffered reason is not true, but instead is a pretext for intentional discrimination. *Hicks, 509 U.S. at 507-8.* On summary judgment, in this third step, the plaintiff must substantiate his claim of pretext through evidence demonstrating that discrimination lay at the heart of the employer's decision. *See Rubinsetin v. Adm'rs of the Tulane Educ. Fund, 218 F.3d 392, 400 (5th Cir. 2000); . . . Evans, 246 F.3d at 351* (defining relevant inquiry as whether the plaintiff has presented evidence that the "justification was a pretext" for racial discrimination). If the plaintiff can show the employer's asserted justification is false, this showing, coupled with a *prima facie* case, may permit the trier of fact to conclude that the employer discriminated against the plaintiff without additional evidence. *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000).* However, such a showing will not always be enough to prevent summary judgment, because there will be cases where a plaintiff has both established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, yet "no rational factfinder could conclude that the action was discriminatory." *Id.* Whether summary judgment is appropriate depends on numerous factors, including "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that

properly may be considered." *Id. at 148-49.*
*Price v. Federal Express Corp.,* 283 F.3d 715, 719-20 (5th Cir. 2002).

      1.    Whether Woods Established a *Prima Facie* Case of Discrimination

To begin with, Woods fails to present any evidence that Casilio knew the race of the candidates when making her selections. The Form 3330 does not disclose a candidate's race. Casilio states that form was the only thing she used to make her selections, and Woods fails to offer any evidence to the contrary. Woods argues, nonetheless, that Casilio knew his race because she stated in her deposition "that she could tell someone's color/race after speaking with them on the phone." (Pl.'s Resp. at 9.) A review of her deposition testimony, however, reveals Casilio never made such a claim.[7] That notwithstanding, Woods provides no evidence that Casilio ever spoke to or even met with any of the candidates as part of her selection process.

Woods further argues that Casilio knew his race because he claims that her assistant manager, Pat Smith, was aware that he was a minority. But Woods fails to support this claim with any competent evidence. There is no declaration from Smith or any other evidence showing that Smith knew Woods's race or color. And

---

[7] See note 4, *supra*.

21

even if Smith was aware of Woods's race and color, Woods also fails to present any evidence showing that, or how, Smith conveyed this knowledge to Casilio. Again, there is no declaration from Smith or anyone else indicating that Smith had communicated her knowledge of Woods's race to Casilio. In contrast, there is competent summary-judgment evidence that Casilio was unaware of the race or color of any of the candidates when she made her selections.

Putting that aside, Woods still fails to establish a *prima facie* case for discrimination because he fails to show that he was qualified for a position at the DFW TRACON facility——factor two of the *McDonnell Douglas* factors. Woods did not meet Casilio's minimum requirement of having recent radar experience at a facility rated above level eight to be considered for a position at the DFW TRACON facility.

In her declaration, Casilio stated that there is a very large number of candidates who apply through the IPP for a position at the DFW TRACON facility. Casilio had a short period of time in which she could select her candidates to fill the newly funded vacancies. She was informed of these vacancies in September 2003 and told she had to make her selections before the end of the fiscal year, September 30, 2003. Based on that short period of time, and based on her desire to select candidates she believed would quickly and successfully obtain their CPC at her facility, she decided to narrow the pool of candidates by instituting the

requirement that they have recent radar experience and had obtained their CPC from a facility rated above level eight. Woods neither had recent radar experience nor was he coming from a facility rated above level eight.

Woods does not dispute that Casilio had the discretion to require additional qualifications that would effectively knock out many candidates who applied for a transfer to the DFW TRACON facility. *See Scales,* 181 F.3d at 709-11 (holding manager in FAA southwest region had authority to add requirements for a position to whittle down candidate pool). Casilio's minimum requirements "were applied in the same way to all candidates without regard to race," or age. *Id.* at 711. In the absence of any evidence that Casilio's requirements were designed to eliminate older African-American candidates, the Court concludes there was nothing prohibited about the additional qualifications Casilio placed on candidates seeking a position at the DFW TRACON facility. Since Woods fails to show that he met those additional qualifications, he fails to make a *prima facie* case of discrimination. *See Id.* (holding plaintiff failed to establish a *prima facie* case of discrimination because she did not meet selecting official's additional minimum requirements despite meeting minimum require-ments on an advertisement for that position).

2. Whether Casilio's Explanation for Her Selection Criteria and Her Explanation for Why She Selected the Four Candidates Over Woods was Pretextual

Alternatively, Secretary Peters argues that Woods has failed to show that Casilio's reason for her selection criteria, why she selected the four candidates, and why she did not select Woods, was a pretext for discrimination. Woods does not argue that Secretary Peters has failed to meet her burden under step two of the burden-shifting framework in *McDonnell Douglas.* Nevertheless, Casilio has asserted legitimate, nondiscriminatory explanations for what her selection criteria was, why that was her selection criteria, why she selected the candidates she did, and why she failed to select Woods. Casilio's reasons are clear and reasonably specific and detailed. *See Okoye v. The University of Texas Houston Health Center,* 245 F.3d 507, 513 (5th Cir. 2001)(stating to meet burden of providing a legitimate, nondiscriminatory reason, the reason must be "both clear and reasonably specific"). Taken as true, Casilio's reasons permit the conclusion that there was a legitimate and nondiscriminatory reason for Woods's failure to be selected for a position at the DFW TRACON facility. Thus, the Court concludes that Secretary Peters has met her burden of producing evidence of a legitimate, nondiscriminatory justification for Woods's nonselection.

To show that Casilio's reasons are pretextual, Woods argues that there has been no African-American air-traffic controllers

hired at the DFW TRACON facility and that at the time of the selections, DFW TRACON had approximately ninety employees, none of whom were African-American. (Pl.'s Resp. at 8.) Despite failing to present any evidence of the racial demographics of the DFW TRACON facility, Woods's own evidence contradicts this baseless allegation. In his appendix, Woods submitted the deposition of John Jones, who, according to Jones, was the operations manager at the DFW TRACON facility until his retirement in November 2006. (Pl.'s App. at 39.) Even Woods himself concedes Jones is an African-American. (Pl.'s Resp. at 10.)

Woods argues that Casilio's reasons are pretextual because she did not follow the normal protocols in making her selections. Relying on the testimony of Jones, Woods contends that normal protocol required Casilio to consult with her operations managers, one of whom was Jones, an African-American, prior to making her selections. "By circumventing [the] normal protocols and not consulting with John Jones, the African-American Operations Manager, it was obvious [that] Casilio had no intention of promoting diversity at the [DFW] TRACON [facility]." (*Id.*) Woods, however, fails to mention that in Jones's deposition, Jones explains that in this circumstance Casilio "had to make the selections in a hurry because it was toward the end of the fiscal year, and [she] didn't have time to consult with anyone." (Pl.'s App. at 40.)

Next, Woods asserts,

> Although not controlling in this Court, in an
> earlier decision, the EEOC administrative
> judge, Honorable Judge Rosenberg, found that
> Woods established a *prima facie* case of dis-
> crimination on the basis of race, color, and
> age.   The Judge ruled that, among other
> things, Woods's earlier attempt to transfer to
> Dallas Love Field, which had a position open
> for Woods, was blocked by Ms. Casilio who was
> working at the FAA Regional Office ASW-500 at
> the time.   This is the same person who blocked
> Woods in September 2003.

(Pl.'s Resp. at 17.)   Notwithstanding Woods's failure to present
any evidence to support this, Secretary Peters has presented
evidence of Judge Rosenberg's decision, which, according to
competent summary-judgment evidence, is the only EEOC complaint on
file regarding Woods.   (Def.'s Reply App. at 4.)   Nowhere does
Judge Rosenberg mention or find that Casilio had previously
thwarted Woods's attempt to transfer to Dallas Love Field.   (*Id.* at
6-14.)   And while Woods is correct that Judge Rosenberg did
conclude that Woods established a *prima facie* case of discrimina-
tion, Woods is also correct that Judge Rosenberg's conclusion is
"not controlling on this Court."   (Pl.'s Resp. at 17.)

Finally, Woods argues that Casilio's reasons are pretextual
because her declaration "is replete with contradictions."   (Pl.'s
Resp. at 9.)   Woods claims that Casilio stated that she needed to
fill her positions by the end of December 2003, yet she was willing
to wait several years before one of the selected candidates would
be available to transfer to her facility even though he was

available immediately.  First, nowhere in her declaration does Casilio state that she needed to fill the positions by December 2003.  She states that she needed to make her selections before September 30, 2003.  Second, Casilio explained that after she made her selections, she learned that one of her selectees, Johnson, who is one of the two selectees that Woods does not contest was more qualified than he, would not be released from his facility until sometime in 2006. (Def.'s App. at 9.)  Despite that delay, Casilio decided she could wait for Johnson because she believed he could obtain his CPC in less time than if she hired a less experienced CPC-in-training. (*Id.*)  And third, Woods presents no evidence that he himself was immediately available for transfer to the DFW TRACON facility.  The decision to permit the transfer and when it would occur lay with Woods's manager at the Addison facility, and Woods does not present any affidavit or declaration from his manager that he would have been approved for immediate transfer.

Casilio did state that, for consideration, a candidate had to have recent radar experience from a facility classified above level eight.  Clogston, however, was at a facility that was classified at level eight, not above.  But Casilio explained that prior to her becoming the manager, Clogston was part of a three-way mutual reassignment that provided for his transfer to the DFW TRACON facility.  Casilio explained that she felt obligated to honor that reassignment agreed to by the former manager.  Woods offers no

evidence to show that this was not true.

Woods takes exception to Casilio's opinion that the candidates she selected would be more successful in obtaining their CPC than he would. He contends that "his education, experience, and background show a better pattern of success in . . . training . . . ." (Pl.'s Resp. at 9.) But having a difference of opinion as to which criteria better assesses a candidate's ability to successfully obtain his CPC at the DFW TRACON facility does not establish that Casilio's emphasis on recent radar experience is a pretext for unlawful discrimination.

Woods also takes exception to Casilio's claim that she offered the position to Fleetwood because she felt the need to "right" his improper dismissal. Woods argues that Casilio "acquiesced" in and "supported" his dismissal and that his being rehired "rectified" any unfairness in his termination. (Pl.'s Resp. at 9.) But she explained that it was the fact that she participated in and supported the decision to terminate Fleetwood that caused her to feel compelled "to right a wrong done by the FAA . . . ." (Def.'s App. at 8.) The fact that Woods is of the opinion that Fleetwood's rehiring by the FAA was sufficient to rectify any perceived unfairness in Fleetwood's termination does not show that Casilio's reason is pretextual.

The remainder of Woods's arguments challenge the assertion that he did not have recent radar experience. He contends that he

was trained on the D-BRITE equipment, "which is radar equipment." (Pl.'s Resp. at 14.) He states that he continued to use radar daily in his position at Addison, and contends that even though technically the Addison facility did not have "titled radar positions . . . employees at Addison perform radar tasks in radar positions, even though they are not titled as such." (*Id.*) Still again, Woods presents no evidence to support these contentions. He does not present an affidavit or declaration from the manager of the Addison facility explaining any radar functions or tasks that air-traffic controllers assigned there perform on a regular basis. And although Woods makes much ado about the extensive radar training he has received, he presents no evidence to refute Secretary Peters's evidence that he has not been certified in a radar position in more than twenty years.

The Court concludes that Woods has failed to produce any evidence that the legitimate, nondiscriminatory reason for his nonselection is false or otherwise a pretext for discrimination. Moreover, Woods fails to establish that he "was clearly better qualified than" the candidates selected for the position. *See Celeste v. Citgo Petroleum Corp.,* 266 F.3d 343 356-57 (5th Cir. 2001). Therefore, the Court concludes that Woods has failed to present any evidence that there is a genuine issue of material fact that his failure to be selected for a position at the DFW TRACON facility was the result of intentional discrimination based upon

his race and age.[8]

III. Conclusion

For the foregoing reasons, Secretary Peters's motion for summary judgment is GRANTED, and Secretary Peters is entitled to Judgment as a matter of law.

SIGNED September 19, 2007.


_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

---

[8] In his complaint, Woods pleads a cause of action for age discrimination based on his failure to be selected for a position at the DFW TRACON facility. Although he pleads a cause of action for age discrimination, Woods's complaint simply states that he suffered from age discrimination because he was discriminated against based upon his race under Title VII, 42 U.S.C. § 2000e. (Pl.'s Compl. At 5.) Furthermore, Woods's response to Secretary Peters's summary-judgment motion focuses exclusively on his claim of racial discrimination. And although Secretary Peters does not dispute that all of the candidates selected over Woods were younger than Woods, for the same reasons discussed above, the Court concludes that Woods has failed to establish a *prima facie* case of age discrimination or that any of Casilio's legitimate, nondiscriminatory reasons for her selection criteria and why she selected the candidates she did over Woods was a pretext for age discrimination. *See Smith v. City of Jackson*, 352 F.3d 183, 196 (5th Cir. 2003)(applying *McDonnell Douglas* framework in age discrimination cases).